<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARCO PEREZ,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>STEVEN MERENDINO, *et al.*,<br><br>　　　　　　Defendants. | Civil Action No. 23-23431 (GC) (TJB)<br><br>**<u>OPINION</u>** |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court on the Motion to Dismiss (Motion) (ECF No. 61) *pro se* Plaintiff Marco Perez's First Amended Complaint (FAC) (ECF No. 43) for lack of jurisdiction under Federal Rule of Civil Procedure (Rule) 12(b)(1) and for failure to state a claim under Rule 12(b)(6) filed by Defendants Glenn Martin, Health Services Administrator ("HSA Martin"); Dr. Richard DiMonte, Clinical Director ("Dr. DiMonte"); and Camilla Hansen, Advanced Registered Nurse Practitioner ("ARNP Hansen") (collectively "Federal Defendants"). Plaintiff opposed the Motion (ECF No. 72), and Defendants filed a reply (ECF No. 75). The Court has carefully reviewed Plaintiff's submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The FAC

According to the FAC, Plaintiff's claims arise out of the deliberate indifference of the following individuals, who were employed by the Federal Bureau of Prisons ("BOP") at FCI Fairton, Fairton, New Jersey: (1) HSA Martin; (2) Dr. DiMonte, the Clinical Director at FCI Fairton; and (3) ARNP Hansen.  (ECF No. 43 at 1.)  "These defendants are responsible for withholding or delaying necessary medical diagnoses, treatment, and care arising from Mr. Perez['s] documented gluten allergy; depriving Mr. Perez of his gluten-free medical diet."  (*Id.*) The Federal Defendants' actions allegedly resulted in several serious adverse health consequences, *e.g.*, excessive weight gain and loss, an increase in Plaintiff's A1C levels (according to his latest lab results) to a potentially dangerous level of 7.0, deprivation of adequate nutrition, itching, rashes, swelling, general pain and suffering, and financial losses because Plaintiff had to pay for his own meals.  (*Id.*)  Plaintiff further alleges that the Federal Defendants failed to act or intervene in any meaningful capacity to alleviate his serious medical needs and that he has exhausted all available administrative remedies.  (*Id.*)

On or about April 3, 2023, Plaintiff was transferred to FCI Fairton.  (*Id.* at 1-2.)  Prior to the transfer, Plaintiff was housed at FMC Devens and the medium care facility at FCI Beaumont. (*Id.*)

On June 8, 2020, results from a lab analysis showed "'abnormal' 'Food Allergy Profiles' for: Shrimp (F024-IgE); Scallop (F338-IgE); Wheat (F004-IgE); and Sesame Seed (F010-IgE)." (*Id.* (quoting ECF No. 43-2, FAC1[1]).)  "The 23.20 reading for shrimp is considered 'Class V [of

---

[1]     Plaintiff attached his medical records and other documents as exhibits to the FAC.  (ECF No. 43-2.)  The Court cites these documents based on Plaintiff's numbering, *i.e.*, "FAC1."

VI] Very High'; .12 is Class 0/1 Equivocal/Low' for Scallop; .23 is same for Wheat and .21 is same for Sesame Seed." (*Id.* (alteration in original) (quoting FAC1).)

On June 16, 2020, P. Ruze, MD, created a "Modified Diet Request" indicating "X Other: Gluten Free Exp. Date 6/16/2021" and listed as "Allergies"—"Scallop, Wheat, and Sesame Seed" (with a diagnosis date of June 12, 2020). (*Id.* (quoting FAC5).) According to a February 1, 2021 observation by Dr. Murray Scott, Plaintiff had "<12" papules on his body, which Plaintiff called a rash, there were 2-mm circular red papules without pustule on Plaintiff's upper arms and upper thighs without surrounding erythema or excoriation. (*Id.*)

On May 14, 2021, Plaintiff was seen by Dr. Christine Kannler for "Skin Problem" Complaint. (*Id.*) Dr. Kannler documented the following:

> [P]atient is here for follow-up of itchy rash. Present since September 2020 but in my previous visit with him he reported the rash started Feb. 2020. He reports weight loss from 214 to 172 pounds . . . reports that he started itching when he eats though present all the time. Has had previous allergy testing and states that he has a wheat allergy. He tries gluten free diet but doesn't always get gluten free diet. He notes canola oil and roast beef also cause itching. Previous labs shoe (sic) elevated IgE for (sic) shrimp, scallop, wheat, sesame seed . . . clearly he has lost weight as evidenced by pannus on left hand and forearm there are 2 erythematous papules apprx. 3 mm in size . . .

(*Id.* (alterations in original) (quoting FAC3).) Additionally:

> Dr. Kannler also noted that there is a "[p]ossible Dermatitis Herpetiformis secondary to celiac disease." A biopsy was done. It was also requested for a "antitranglutaminase AB" blood test be done; and if negative, an "anti-endomysial" blood test be done. Positive labs would then cause "celiac diet to be instituted" and then a need to see "GI as these patients can have lymphocytic colitis or Enteropathy associated with T-cell lymphoma."

(*Id.* (alteration in original) (quoting FAC2).)

According to the FAC, on August 2, 2022, John Sanchez, LVN (Licensed Vocational Nurse), noted allergies to "Wheat Bran, Oat Grain (Diagnostic), Fish Meal, Oil Base/Canola Oil,

and Shrimp (Diagnostic)."  (*Id.*)  Dr. Luis Ramos saw Plaintiff at a clinical encounter on August 10, 2022, and documented under the "Subjective Complaint" heading the following:  "Celiac Disease? no antibody detected will order endomysial abx to prove will c/w gluten free diet until diagnosis (sic)."  (*Id.* (quoting FAC6).)

On the same date, John Fernon, NP (Nurse Practitioner), submitted a request for a dietician consultation for "Celiac Disease: Gluten Free Diet" with a target date of August 17, 2022.  (*Id.*)  NP Fernon saw Plaintiff for a skin problem on September 21, 2022.  (*Id.*)  Plaintiff reported that he had a rash on his trunk and back for the prior two weeks and that he was on a gluten-free diet but believed some of his food had gluten.  (*Id.* (quoting FAC7).)  Plaintiff alleges that his gluten-free food was contaminated when it is prepared by the food services department.  (*Id.*)  On November 2, 2022, NP Fernon noted that Plaintiff was waiting for a dietary consultation approved in May 2022.  (*Id.*)  NP Fernon saw Plaintiff again on February 8, 2023, stating after the appointment that: "Inmate still has open Dietary Consult because he states that he has Celiac Disease.  However, an Endomysial Antibody IgA lab was negative in December 2022 indicating that he does not have a bowel disorder."  (*Id.*)  On January 10, 2023, Dr. Ramos submitted a modified diet request stating "'X Other: Wheat, Oat Grain, Fish Meal, Shellfish, Shrimp Allergies Exp Date 01/10/2024 Comments GLUTEN FREE DIET."  (*Id.* (emphasis in original( (quoting FAC9).)

On or about April 6, 2023, Plaintiff was seen by FCI Fairton health services providers, specifically Dr. DiMonte and ARNP Hansen.  (*Id.* at 1-2.)  According to the FAC, "[t]he sole medical condition concerned herein is Mr. Perez's documented gluten allergy," "[t]he defendants rescinded a medical diet order placed by a prior BOP doctor without clinical support or indication

that doing so was the most effective course of treatment" and that "[t]hese acts have deprived Mr. Perez of the gluten-free meal he was prescribed." (*Id.*)

Specifically, CRNP Hansen implemented a "Modified Therapeutic Diet Request," dated April 5, 2025, to include only "X Other shellfish free diet Exp. Date: 04/05/2024," thereby rescinding the January 10, 2023 request made by Dr. Ramos. (*Id.* at 2 (quoting FAC8).)

On April 6, 2023, Dr. DiMonte made the following observation under "Complaint 4":

> Inmate has been on a gluten free diet with no definitive medical diagnosis. See 14 day note 08/02/22, they were thinking Celiac Disease but he was negative for the antibodies. The (sic) state they will continue the gluten free die until the (sic) come up with a diagnosis by GI biopsy. Inmate had allergy testing 06/08/2020 showing very high allergy to shrimp and equivocal/low for scallop, wheat, sesame seed (sic).

(*Id.* at 2-3 (alterations in original) (quoting FAC10).)

On the same date, ARNP Hansen noted "Will place dietician consult" and provided the following explanation for requesting this consultation:

> Inmate underwent allergy testing 6/8/20 after developing rash. Showed very high IgE reaction to shrimp and low IgE response scallop, wheat, and sesame seeds or shellfish. Inmate was seen by BOP dietician 6/16/20 who wrote for gluten free diet with no sesame seeds or shellfish. Appears that despite diet changes rash persisted and was possibly due to medications. Clinical practice guidelines do not support continued specialty diet except for a no shellfish diet. REQUESTING TELEHEATH CONSULT TO DISCUSS IF GLUTEN FREE DIET IS WARRANTED. (emphasis added). Has no previous history of anaphylaxis response.

(*Id.* at 3 (alterations in original) (quoting FAC11).)

On the next day, Plaintiff submitted a request regarding his allergies and diet, and K. Knowles, PA-C (Physician Assistant-Certified) responded in writing that an appointment was scheduled for April 21, 2023. (*Id.*) On April 19, 2023, Mitchel Holliday, RD/CDE (Registered Dietician/Certified Diabetes Educator) created an "encounter administrative note" regarding

5

Plaintiff's medical status "suggest[ing] repudiation of allergy claims and findings; in addition, the record notes that staff should 'consider reintroduction of wheat into diet and monitor related symptoms.'"  (*Id.*)  ARNP Hansen saw Plaintiff on April 21, 2023, noting that Plaintiff desired a gluten-free diet, and, on the same date, Amanda Stites, RDH (Registered Dental Hygienist), generated a historical medication summary listing the allergies noted on August 2, 2022 (and specifying Plaintiff reacted with a rash to Wheat Bran, Oat Bran (Diagnostic), Fish Meal, and Oil Base (Canola Oil), and had an intolerance to Shrimp (Diagnostic)).  (*Id.* (quoting FAC12).)  Two days later, ARNP Hansen entered a record indicating that Plaintiff's "Scallop," "Wheat," and "Sesame Seed" allergies were "Resolved."  (*Id.*)  Plaintiff alleges that there were no changes in his medical circumstances warranting ARNP Hansen's action.  (*Id.*)

On May 2, 2023, Plaintiff submitted a health services paper request concerning his allergies and diet.  (*Id.* at 4.)  Dr. DiMonte responded that "there had been no documented testing [of any kind] for rashes since Mr. Perez arrived at FCI Fairton."  (*Id.*)  ARNP Hansen also responded to a July 3, 2023 request by merely acknowledging its receipt.  (*Id.*)  On July 17, 2023, ARNP Hansen made the following notations:

> Inmate with multiple complaints is requesting to restart gluten free diet. States that gluten free items are not available from chow hall and therefore he has to eat these items. States that eating foods with gluten make him break out in rash. Does not have rash presently.
>
> Gluten intolerance: labs dated 6/8/2020 indicate gluten intolerance and not an allergy. No indication to repeat labs at this time. Will need to self-select gluten free foods as gluten free diet not indicated.

(*Id.* (quoting FAC14-15).)

Plaintiff alleges that "[e]vidence derived from medical journals" indicate an intolerance and an allergy require similar treatment and care; the only differences are with respect to the health effects and symptoms; on information and belief, intolerance usually involves gastrointestinal

distress with no immune response while an allergy involves an immune system reaction; and if a gluten-related disorder is suspected, it is important to consult with a healthcare professional for diagnosis and treatment. (*Id.*)

On October 25, 2023, ARNP Hansen prescribed a short course of topical steroids for atopic dermatitis, while further observing that Plaintiff's current rash was not consistent with a food allergy and that she advised him to purchase hydrocortisone cream from the commissary. (*Id.*) ARNP Hansen also allegedly noted that the cream was not effective but persisted on that course of treatment: "Inmate complaining of small bumps & rash to some of his fingers and legs. Areas are itchy. Believes rash is caused from eating gluten. Has tried hydrocortisone cream from commissary without any relief." (*Id.* (quoting FAC14).) On February 10, 2024, HSA Martin allegedly created a memorandum asking the commissary to remove purchase limits of gluten-free items to alleviate his adverse reactions (including rashes and itches as well as other physical and psychological reactions). (*Id.*)

Under the "Personal Injury" section of the FAC, Plaintiff claims that it is undisputed that he was identified with an allergy to wheat and wheat by-products; Dr. Ramos ordered a gluten-free diet through at least January 10, 2024; and ARNP Hansen disregarded Dr. Ramos's and Dr. DiMonte's orders indicating that further testing was required (which was never performed). (*Id.*)

Furthermore, "[m]ultiple records" allegedly show that the issue was not resolved by "self-selecting" items from "the main National Menu," and, when Plaintiff reported continuing symptoms, he was ignored. (*Id.*) Specifically, Plaintiff attaches "a copy of the Federal Bureau of Prisons-FY-2024-Gluten FREE (GF) MENU [that] specifically states that: 'Soup bases, condiments, meats, cheeses and any other gluten-containing food should not be offered unless specifically identified as gluten free by the local [Food Services Administrator].'" (*Id.* (alterations

in the original) (quoting FAC19).) According to Plaintiff, if the food items on the gluten-free menu had contaminants, "how much greater the probability [of contaminated items self-selected from] the main National Menu?" (*Id.*) However, the Federal Defendants "simply didn't care." (*Id.*)

Plaintiff additionally alleges that he was told to buy creams and topical ointments even though evidence shows that such products did not resolve his issues; "despite personal knowledge," Dr. DiMonte failed to intervene in his capacity as the overall head of the Health Services Department with responsibility to oversee the provision (or in this case withholding) of medical treatment; HSA Martin similarly failed to intervene in the wrongful conduct of the other two Federal Defendants but instead created a memorandum allowing Plaintiff to exceed the purchase limits for gluten-free items due to his documented gluten allergy (thereby demonstrating knowledge that Plaintiff required gluten-free foods but only at his own expense); the Federal Defendants failed to provide any meaningful testing, diagnoses, treatment, or care for Plaintiff's serious medical conditions, which has resulted in Plaintiff being forced to eat processed foods at his own expense or risk further aggravation of his symptoms by consuming food from the National Menu. (*Id.* at 4-5.)

In the end, Plaintiff claims that he has been subjected to unnecessary pain and suffering as a result of the acts or omissions of the Federal Defendants, who, for more than twenty months, knew, or had reason to know, that Plaintiff was in medical distress but failed to act. (*Id.* at 5.) Plaintiff seeks $5.5 million in damages as well as an order directing all staff at FCI Fairton from any acts or omissions that reasonably constitute, or appear to constitute, retaliation against Plaintiff, and the reinstitution of his gluten-free special medical diet. (*Id.* (further asking Court to find in Plaintiff's favor on his claims, schedule the matter for a jury trial if a reasonable settlement

cannot be reached by the parties, and determining a damages amount upon conclusion of this trial).)

### B.    Procedural History

Plaintiff's initial Complaint was received on December 22, 2023, and the full filing fee was paid on February 23, 2024.  (ECF Nos. 1, 4.)  On January 13, 2025, Plaintiff filed his FAC.[2]  (ECF No. 43.)  Subsequently, Plaintiff filed a motion to withdraw his preliminary injunction motions (ECF Nos. 11, 18, 54) as moot.  (ECF No. 58.)  According to Plaintiff, as of April 25, 2025, he would be transferred to the custody and control of U.S. Immigration and Customs Enforcement ("ICE").  (*Id.* at 1.)  On April 30, 2025, the Court granted the motion to withdraw.  (ECF No. 60.)

On May 5, 2025, the Federal Defendants moved to dismiss the FAC.  (ECF No. 61.)  The Court granted Plaintiff, who was eventually removed to Mexico, several extensions of time to file his response.  (ECF Nos. 66, 69, 71.)  Plaintiff filed his response on September 9, 2025 (ECF No. 72), and, having been granted an extension of time (ECF No. 74), the Federal Defendants filed a reply brief on September 26, 2025 (ECF No. 75).

## II.    LEGAL STANDARDS

The Federal Defendants move to dismiss under Rule 12(b)(1) and 12(b)(6).

### A.    Rule 12(b)(1)

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds.  *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford*

---

[2]    In his original Complaint, Plaintiff named a fourth defendant, Warden Steven Merendino.  (*See* ECF No. 1 at 1.)  However, Merendino was voluntarily dismissed from this case.  (ECF No. 41.)

*Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1997)).  In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc.*, 220 F.3d at 176 (citing *Mortensen*, 549 F.2d at 891).  "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Recom Solar, LLC*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021) (citing *Mortensen*, 549 F.2d at 891).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citing *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).  The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen*, 549 F.2d at 891).  "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268 (citing *Davis v. Well Fargo*, 824 F.3d 333, 348-50 (3d Cir. 2016)).

### B.    Rule 12(b)(6)

On a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins.*

*Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).

In deciding a Rule 12(b)(6) motion, the court can only consider "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider any document "integral to or explicitly relied upon in the complaint" when ruling on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)). Because Plaintiff is proceeding *pro se,* the Court construes his allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (noting that courts must remain flexible, especially when dealing with imprisoned *pro se* litigants). However, "pro se litigants still must allege sufficient

facts in their complaints to support a claim." *Id.* (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 329, 244-45 (3d Cir. 2013).

## III.    DISCUSSION

### A.    Plaintiff's Claims for Prospective Relief

In his FAC, Plaintiff seeks injunctive relief in the form of an order directing FCI Fairton staff to refrain from retaliating against Plaintiff and directing the BOP to reinstitute his gluten-free special medical diet.  (ECF No. 43 at 5.)  Liberally construing this pleading, it also appears to request declaratory relief, *i.e.*, that the Court "find in favor of Mr. Perez based on the claims presented in this FAC."  (*Id.*)  Raising a factual challenge to this Court's jurisdiction, the Federal Defendants argue that Plaintiff's release from FCI Fairton moots his claims for prospective relief.  (ECF No. 61-1 at 8-9.)  Plaintiff does not respond to the Federal Defendants' argument; in fact, he acknowledged such claims would become moot in his successful motion to withdraw the motions for preliminary injunction. (*See* ECF No. 58.)   Accordingly, the Court dismisses Plaintiff's prospective relief claims as moot.

Under Article III of the United States Constitution, federal courts only have jurisdiction over a matter where there is a live case or controversy to be resolved.  *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "The parties must continue to have 'a personal stake in the outcome' of the lawsuit."  *Id.* at 478 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).  "[I]f a case no longer presents a live case or controversy, the case is moot, and the federal court lacks jurisdiction to hear it." *Williams v. New Jersey*, No. 18-14964, 2020 WL 3259223, at *2 (D.N.J. June 16, 2020) (citing *Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 261 (3d Cir. 2002)).  "An action becomes moot when '(1) there

is no reasonable expectation that the alleged events will recur . . . and (2) interim relief or events have completely eradicated the effects of the violation.'" *Ames v. Westinghouse Electric Corp.*, 864 F.2d 289, 291-92 (3d Cir. 1988) (alteration in original) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Under these principles, "[a]n inmate's transfer from the facility complained of generally moots the equitable and declaratory claims." *Folk v. Warden Schuylkill FCI*, No. 23-1935, 2023 WL 5426740, at *2 (3d Cir. Aug. 23, 2023) (per curiam) (alteration in original) (quoting *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) (per curiam)).

Plaintiff admitted in his withdrawal motion that, "as he will no longer be subject to the custody and control of the BOP, nor is it likely he will be returned to this facility [FCI Fairton] in the near future, the motions for preliminary injunction are now moot; as of 4/25/2025" and that "[t]his date is when Mr. Perez will be transferred to the custody and control of the DHS/ICE authorities." (ECF No. 58 at 1.) On April 25, 2025, the BOP released Plaintiff from custody and ICE took him into custody for deportation pursuant to a final order of removal. (*See* ECF No. 61-2 ¶ 1.) Subsequently, ICE removed Plaintiff to Mexico. (*See* ECF No. 72 at 1.)

Accordingly, Plaintiff's requests for injunctive and declaratory relief regarding retaliatory conduct and the reinstatement of his prescribed gluten-free diet are mooted by Plaintiff's release from BOP custody (and subsequent deportation). *See Lamberti-Ledezma v. FCI Fort Dix Warden*, No. 25-10040, 2025 WL 303990, at *3 (D.N.J. Oct. 30, 2025).

### B. Plaintiff's *Bivens* Claims for Damages Against the Federal Defendants

Plaintiff also seeks monetary damages "pursuant to the Eighth Amendment of the United States Constitution, 42 U.S.C. § 1983, [*Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)], [*Carlson v. Green*, 446 U.S. 14 (1980)], and in accordance with [*Farmer v. Brennan*, 511 U.;S. 825 (1991)." (ECF No. 43 at 5.) Liberally construed, the FAC

13

raises two claims or theories of liability under the Eighth Amendment related to Plaintiff's alleged gluten or wheat allergy, medically prescribed diet, the food actually available to Plaintiff as part of his prescribed diet, and the effects on Plaintiff's health: (1) denial of adequate nutrition; and (2) denial of adequate medical care.

While § 1983 creates a damages claim against state actors who violate the United States Constitution, Congress has never enacted a similar statute creating damages claims against federal actors for their constitutional violations.  *See Lamberti-Ledesma*, 2026 WL 303990, at *4 (citing *Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017)).  Applying the fundamental principle that every right must have a remedy, and every injury proper redress, federal courts previously used their putative common-law powers to grant damages remedies in suits against federal officers.  *See Muniz v. United States*, 149 F.4th 256, 260 (3d Cir. 2025).  "But the landmark decision of *Erie R&R. Co. v. Tompkins*[, 304 U.S 64 (1938),] transformed our legal landscape—concluding that 'there is no federal general common law,'" rendering the federal judiciary's authority to recognize a damages remedy uncertain.  *Muniz*, 149 F.4th at 260.

In *Bivens*, the Supreme Court recognized an implied private cause of action under the Fourth Amendment to recover damages against federal actors.  *See* 403 U.S. at 389, 395-97. However, *Bivens* has *rarely* been extended to permit a cause of action for damages liability since it was decided in 1971.  Indeed, since *Bivens*, the Supreme Court has expanded the *Bivens* remedy to other constitutional violations only twice: under the Fifth Amendment's Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979), and under the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1986).  *See Egbert v. Boule*, 596 U.S. 482, 486 (2022) (emphasizing that the Supreme Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations" (citations omitted)).

"The Supreme Court has cautioned on the separation of powers when courts expand *Bivens* causes of actions." *Marinaccio v. United States*, No. 21-11167, 2022 WL 2833960, at *6 (D.N.J. July 20, 2022) (citing *Abassi*, 582 U.S. at 133 (citation omitted)). The Supreme Court has reiterated that "Congress is far more competent than the Judiciary to weigh such policy considerations . . . and the Judiciary's authority to do so at all is, at best, uncertain." *Egbert*, 596 U.S. at 491 (citations and quotations omitted). *Egbert* explained that "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, courts must refrain from creating [it]." *Id.* (alteration in original) (quoting *Abassi*, 582 U.S. at 137). "The [Supreme] Court now views 'creating a cause of action [a]s a legislative endeavor,' *Egbert*, [596 U.S. at 491] (quotation omitted)," and "it has discarded implied actions as relics of an '*ancien regime*,' [*Abassi*, 582 U.S. at 131] (quotation omitted), suggesting 'if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action,' *Egbert*, [596 U.S. at 502]." *Muniz*, 149 F.4th at 260 (alterations in original). "But the Court has not "dispense[d] with *Bivens* altogether." *Id.* (quoting *Egbert*, 596 U.S. at 491); *see also id.* at 261 (explaining that, with the passage of the Westfall Act in 1981, Congress left *Bivens* where "it found it" but granted no license to create a new *Bivens* remedy (quoting *Hernandez v. Mesa*, 589 U.S. 101, 111 n.9 (2020))).

There are two steps used to determine whether a claim under *Bivens* may exist: (1) "we ask whether the case presents a 'new *Bivens* context'--*i.e.*, is it 'meaningful[ly]' different from the three cases in which the Court has implied a damages action;" and (2) "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 596 U.S. at 492 (citations omitted). These two steps "often resolve to a single question: whether there is any reason to think that Congress might be better

equipped to create a damages remedy." *Id.* "In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.'" *Abassi*, 572 U.S. at 136 (cleaned up) (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 426-27 (1988)).

Under step one of the framework, "even a modest extension is still an extension." *Abbasi*, 582 U.S. at 147; *see also Hernandez* 589 U.S. at 102 ("[The Supreme Court's] understanding of a 'new context' is broad."). Potential factors include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Kalu v. Spaulding*, 326 F.4th 311, 326 (3d Cir. 2024) (quoting *Abassi*, 582 U.S. at 139-40). In *Muniz*, the Third Circuit recently explained that, "in *Egbert v. Boule*, the Supreme Court clarified that 'a new context arises' even under the first step when 'potential special factors that previous *Bivens* cases did not consider' are presented and those factors 'counsel hesitation'—extending a step-two-like special factors analysis to the first step." *Muniz*, 149 F.4th at 261 (quoting *Egbert*, 596 U.S. at 492-93). "If a case does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available." *Id.* (quoting *Kalu*, 326 F.4th at 326).

At step two, the Supreme Court has noted that there is not "'an exhaustive list' of factors that may provide a reason not to extend *Bivens*," but it has explained that separation of powers principles are "central" to the analysis. *Hernandez*, 589 U.S. at 102 (citations omitted). The proper inquiry is whether there is any reason to think that judicial intrusion into a given field might potentially be harmful or inappropriate. *See Egbert*, 596 U.S. at 496. "If there is even a single

16

'reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* at 492 (citation omitted); *see also id.* at 493 (noting if there are alternative remedial structures in place, that alone can be a special factor).

In the end, "[i]n most every case," the answer to whether a *Bivens* action may lie is the same: "no." *Id.* at 492.

Plaintiff argues that this case does not present a new *Bivens* context as it is "strictly analogous" to *Carlson*. (ECF No. 72 at 2.) According to Plaintiff, he was prescribed necessary medical care by BOP medical professionals prior to his arrival at FCI Fairton, this necessary course of treatment was "direct and clear," and the Federal Defendants chose to rescind the prescribed necessary care for non-medical reasons despite their knowledge that their actions would result in unnecessary and wanton infliction of pain and suffering. (*Id.*) Plaintiff further asserts that he was "continuously" harmed by the lack of treatment and deliberate indifference, and that at no point did any Federal Defendant attempt to protect his health and welfare. (*Id.*) Instead, Plaintiff "was left to provide his own food in the end." (*Id.*)

The Court, however, agrees with the Federal Defendants that Plaintiff's claims regarding his alleged gluten allergy and prescribed gluten-free diet present a new context and that special factors indicate that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing any damages action to proceed (ECF No. 61-1 at 9-21). The Court begins with the first step.

### 1.    New Context

Liberally construing the FAC in his favor, Plaintiff claims that: (1) ARNP Hansen "rescinded a medical diet order [for a special gluten-free diet] placed by a prior BOP doctor without clinical support or indication that doing so was the most effective course of treatment" and

indicated that his allergies were "Resolved"—even though, *inter alia*, a prior lab analysis showed that he had a "equivocal/low" allergic reaction to wheat and sesame seed, Plaintiff was prescribed a modified gluten-free diet because of his allergies, a doctor indicated that the prescribed diet would continue pending an "endomysial abx to prove [Celiac disease]" (and no such test was performed), and Dr. DiMonte likewise noted that, according to the records, the special diet would continue until a "GI biopsy" was performed (which did not occur); (2) Plaintiff reported to ARNP Hansen that he continued to suffer rashes and associated problems due to his diet and stated that gluten-free items were not available from the "chow hall and therefore has to eat these items" causing him to break out in rashes, but ARNP Hansen responded that he had gluten intolerance and would instead need to self-select gluten-free foods from the National Menu; and (3) Plaintiff was seen by ARNP Hansen for bumps and a rash on his fingers and legs, and she prescribed topical steroids and indicated that he should purchase hydrocortisone despite knowing that he had tried hydrocortisone cream without any relief.  (ECF No. 43 at 1-4).

As to the other two Federal Defendants, "[d]espite personal knowledge" (*e.g.*, Dr. DiMonte's review of the medical records noting that Plaintiff had been prescribe a gluten-free diet, which was to continue until his condition was diagnosed by GI biopsy and that he had an "equivocal/low allergy' as well as the doctor's negative response to Plaintiff's request regarding allergies and his diet), Dr. DiMonte allegedly failed to intervene in Plaintiff's treatment in his capacity as the head of the Health Services Department.  (*Id.* at 2-4.)  Similarly, Plaintiff submits that HSA Martin failed to intervene in the actions of the other two Defendants' actions even though Martin created a memorandum allowing Plaintiff to exceed purchase items of gluten-free items.  (*Id.* at 4.)

As a result of the Federal Defendants' actions or omissions, Plaintiff was allegedly forced to consume food containing or contaminated with gluten or, to avoid gluten, to purchase processed foods, resulting in weight fluctuations, an increase in his A1C levels, a deprivation of adequate nutrition, itching, rashes, swelling, general pain and suffering, and financial losses for subsidizing his own meals.  (*Id.* at 1-5.)

The FAC thereby raises two related putative *Bivens* claims under the Eighth Amendment: (1) inadequate nutrition; and (2) inadequate medical care.  As to the first theory of liability, Plaintiff discusses case law governing claims of unconstitutional conditions of confinement under the Eighth Amendment, specifically the alleged denial of nutritionally adequate food.  (ECF No. 72 at 3.)  For instance, according to Plaintiff, "prisoners are entitled to the 'minimal civilized measures of life's necessities, which in the context of providing 'adequate food,' courts have defined as 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it."  (*Id.* (quoting *Skelton v. Branganza*, No. 19-18597, 2024 WL 939688, at *4 (D.N.J. Mar. 4, 2024)).)

To qualify under the *Bivens* framework, Plaintiff's claims must be "sufficiently similar to the Supreme Court's only Eighth Amendment *Bivens* precedent, [*Carlson*]."  *Kalu*, 113 F.4th at 327.

However, an Eighth Amendment nutrition claim presents a new context under the first step of the *Bivens* analysis.[3]  *See Floyd v. United States*, No. 22-1229, 2024 WL 3064671, at *14 (D.N.J. June 20, 2024) ("Plaintiff also alleges an Eighth Amendment claim based on conditions of confinement including overcrowding, lack of sanitation, broken windows, spoiled food, lack of

---

[3]    Although both an inadequate nutrition claim and the medical treatment claim addressed in *Carlson* involve the Eighth Amendment, "[a] claim may arise in a new context even if is based on the same constitutional provision as a claim in which a damages remedy was previously recognized."  *Kalu*, 113 F.4th at 327 (quoting *Hernandez*, 589 U.S. at 103).

heat and lead pipes.  This claim is meaningly different from the three prior cases where the Supreme Court implied a damages remedy, none of which involved the physical living conditions in a prison." (quoting *Mammana v. Fed. Bureau of Prisons*, 856 F App'x 411, 414-15 (3d Cir. 2019))); *Diaz v. Pistro*, No. 21-2909, 2021 WL 3471169, at *3 (E.D. Pa. Aug. 6, 2021) (stating that the plaintiff failed to establish how a diet of being fed only peanut butter and jelly could be addressed in a *Bivens* claim).  Claims "alleging constitutional violations for conditions of confinement and conspiracy arise in a non-medical context which our Supreme Court has not recognized." *Blanding v. Fed. Bureau of Prisons*, No. 21-1115, 2021 WL 5139912, at *5 & n.54 (E.D. Pa. Nov. 4, 2021) (noting that "it would be inappropriate" to recognize a new remedy for Eighth Amendment claims based on serving food (quoting *Figueroa v. Pistro*, No. 21-0041, 2021 WL 601096, at *4 (E.D. Pa. Feb. 16, 2021)); *see also Kalu*, 113 F.4th at 327 (concluding that an Eighth Amendment claim alleging that a prison guard sexually assaulted the plaintiff presented a new context); *Mammana*, 856 F. App'x at 414 (determining that federal inmate's claims of inhumane prison conditions (confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing) constituted a new context).

With respect to his second theory, Plaintiff brings a claim for inadequate medical treatment under the Eighth Amendment.  Although *Carlson* also involved a claim of inadequate medical care, Plaintiff's allegations regarding his gluten or wheat allergy, the prescribed treatment/diet, and the effects on his health present a new context based on the generality or specificity of the official action and the risk of disruptive intrusion in the systematic operations of a federal correctional institution.

In *Carlson*, the Supreme Court recognized a *Bivens* claim brought by the estate of a deceased federal inmate "alleging that he suffered personal injuries from which he died because

of the petitioners, federal prison officials, violated his due process, equal protection, and Eighth Amendment rights." *Carlson*, 446 U.S. at 16.  Specifically:

> [R]espondent alleged that petitioners, being fully apprised of the gross inadequacy of medical facilities and staff at the Federal Correction Center in Terre Haute, Ind., and of the seriousness of Jones' chronic asthmatic condition, nonetheless kept him in that facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital. The complaint further alleges that Jones' death resulted from these acts and omissions, that petitioners were deliberately indifferent to Jones' serious medical needs, and that their indifference was in part attributable to racial prejudice.

*Id.* at 16 n.1; *see also Muniz*, 149 F.4th at 262 ("There, the inmate's [sic] alleged his injuries arose, in part, because 'he was not given proper medication,' 'did not receive the steroid treatments,' and was not granted facility-transfer accommodations for his asthmatic condition." (citing *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978)).

As part of its discussion of the "generality or specificity of the official action" factor, the Third Circuit concluded that the "the medical circumstances leading to Muniz's harm do not provide any meaningful difference to suggest this case arises in a new context from *Carlson*." *Muniz*, 149 F.4th at 262.  Specifically, the *Muniz* court explained that:

> There [*Carlson*], the inmate's [sic] alleged his injuries arose, in part, because "he was not given proper medication," "did not receive the steroid treatments," and was not granted facility-transfer accommodations for his asthmatic condition. *Green*, 581 F.2d at 671. Similarly, here, Muniz alleges his injuries arose because he was denied medications, treatments, and accommodations necessary to address his diabetic condition. Furthermore, both the *Carlson* plaintiff and Muniz allege these denials of adequate care resulted in flare-ups of their medical conditions, necessitating a hospital visit and emergency medical treatment. *Green*, 581 F.2d at 671. Accordingly, the medical circumstances leading to Muniz's harm do

21

> not provide any meaningful difference to suggest this case arises in
> a new context from *Carlson*.

*Id.* The Third Circuit also rejected the argument that the fact that Muniz's injuries were not fatal

constituted a meaningful distinction from *Carlson*:

> It is true that the injuries in *Carlson* were fatal, meanwhile those faced by Muniz were not. But, when looking at special factors, we ask whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, [582 U.S. at 139]. It is unclear why the difference between amputation and death is "meaningful," i.e., provides a "reason to think Congress might doubt the efficacy or necessity of a damages remedy" in this context. *Egbert*, [596 U.S. at 491]. Indeed, this difference neither provides insight into congressional intent nor meaningfully changes the remedial analysis the Supreme Court already undertook in *Carlson*.
>
> On the issue of fatality, we find our sister circuit persuasive that this "difference in degree is not a meaningful difference giving rise to a new context," *Stanard v. Dy*, 88 F.4th 811, 817 (9th Cir. 2023), and therefore, "plaintiff need not suffer death or a life-threatening injury for his claim to be sufficiently analogous to *Carlson*," *Watanabe v. Derr*, 115 F.4th 1034, 1041 (9th Cir. 2024).

*Id.* at 262-63.[4]

However, the *Muniz* court observed that the alleged denials of care to both Muniz and the

decedent in *Carlson* resulted in "a hospital visit and emergency medical treatment." *Id.* at 262. In

contrast, Plaintiff does not allege that the Federal Defendants' conduct resulted in either

hospitalization or emergency treatment. The "new-context inquiry is easily satisfied," and "even

---

[4]    Accordingly, the Third Circuit implicitly rejected the district court's conclusion that Muniz's claims were meaningfully different because "the severity of his injuries have not proven to be fatal." *Muniz v. United States*, No. 22-0816, 2023 WL 8469510, at *5 (D.N.J. Dec. 7, 2023) (citation omitted). The Third Circuit's reasoning is at odds with other prior decisions from this District finding that the plaintiffs' claims implicated a new context because, *inter alia*, they did not involve fatal (or life-threatening) injuries. *See Toro v. Asao*, No. 20-2282, 2024 WL 3548893, at *5-6 (D.N.J. Jul. 24, 2024), *appeal filed* (3d Cir. Aug. 6, 2024); *Yaeger v. Song*, No. 22-5056, 2024 WL 3064673, at *3 (D.N.J. June 20, 2024). Nonetheless, the Third Circuit also noted that the "generality or specificity of the official action" factor was not dispositive, and it affirmed the district court's refusal to imply a *Bivens* remedy on other grounds. *Muniz*, 149 F.4th at 259-65.

a modest extension is still an extension." *Abbasi*, 582 U.S. at 147, 149. "Superficial similarities"

and "almost parallel circumstances" are insufficient to support a *Bivens* claim. *Egbert*, 596 U.S.

at 495 (citations omitted). In *Dynlacht*, the district court observed that the plaintiff alleged he

suffered from sixteen chronic medical conditions (including Crohn's disease) and the following

injuries:

> In terms of the severity of the alleged injuries, the Court understands
> Dynlacht to primarily allege "blood in [his] stool, constipation, pain,
> weight loss, extreme gas (both flatulence and belching, insomnia,)"
> "respiratory and gastrointestinal infections," "higher risk of [skin]
> malignancies," increased "dry scalp & skin and rosacea leading to
> "uncontrolled seborrhea/scaling of [the] face and scalp . . . [causing]
> unbearable itching," as well as hair loss.

*Dynlacht v. Laughingwell*, No. 25-5277, 2025 WL 3026263, at *7 (E.D. Pa. Oct. 29, 2025)

(alterations in original) (citation omitted). Similarly, Plaintiff alleges weight loss and gain, an

increase in his diabetic A1C levels (to the dangerous level of 7.0), deprivation of adequate

nutrition, itching, rashes, swelling, and other unspecified pain and suffering. (ECF No. 43 at 1.)

Although not identical, the alleged harms in this case resemble the alleged injuries at issue

in *Dynlacht*. *e.g.*, Plaintiff in the present matter alleges "itching, rashes, swelling" and Dynlacht

claimed a high risk of skin malignancies as well as dry scalp and rosacea leading to uncontrolled

seborrhea/scaling causing "unbearable itching." (*Id.*); *Dynlacht*, 2025 WL 3026263, at *7.

According to the FAC (and the attached medical records), Plaintiff reported rashes and itches,

which he claimed resulted from his alleged wheat allergy and the consumption of food containing

gluten, and, in their physical examinations of Plaintiff, medical providers (including ARNP

Hansen) noted rashes or papules. (*See* ECF No. 43 at 2-4.) "Notably, in *Tsakonas v. Cicchi*, 308

F. App'x 628, 632 (3d Cir. 2009) the Third Circuit affirmed the dismissal of an Eighth Amendment

claim premised upon a denial of treatment for 'weight loss, eczema of the feet, seborrhea of the

scalp, athlete's foot, constipation, and swollen knuckles on his right hand' on the basis that the prisoner had failed to allege any serious medical conditions." *Ellison v. N.J. State Prison Med. Dep't*, No. 20-9465, 2023 WL 37044, at *3 (D.N.J. Jan. 23, 2023); *see also id.* at *4 ("District courts here and elsewhere, however, have dismissed Eighth Amendment claims involving isolated rashes, eczema, itching, or dry skin." (citations omitted)). In the present matter, Plaintiff does not claim that "the rash is bleeding or infected (*i.e.*, with open sores or wounds)." *Id.* at *4 (observing that "the Third Circuit clarified that the skin condition eczema can be a serious medical condition when the skin is so cracked and dry that it bleeds." (quoting *McKeithan v. Beard*, 322 F. App'x 194 (3d Cir. 2009)). Additionally, Plaintiff does not allege that he went into (or was at risk of suffering) anaphylaxis (ARNP Hansen noted Plaintiff had no history of anaphylaxis response), and, in fact, the allergic testing he emphasizes in his FAC showed only an "Equivocal/Low" reading for Wheat. (*See* ECF No. 43 at 2-3.)

In contrast, *Muniz* found "that [the] denial of adequate medical care resulting in [the] amputation of [a] toe was not meaningfully different from *Carlson* because both plaintiffs alleged denial of adequate care causing flare-ups of medical conditions, and necessitating a hospital visit and emergency medical treatment." *Dynlacht*, 2025 WL 3026263, at *7 (citing *Muniz*, 149 F.4th at 262). Muniz alleged that, as a result of the discontinuance of Metformin and soft-shoe and lower-bunk accommodations, he developed diabetic blisters on his toe and began suppurating pus, requiring antibiotics and wound care, which was not always provided (resulting in extreme pain and worsening conditions), he was eventually taken to the emergency room, an MRI showed that his diabetic ulcers and infection had spread to the bone, and a toe had to be amputated. *Muniz*, 149 F.4th at 258; *see also id.* at 262 (stating that Muniz "alleges his injuries arose because he was denied medications, treatments, and accommodations necessary to address his diabetic condition"

24

and that the denials of adequate medical care resulted in flare-ups of his condition, a hospital visit, and emergency medical treatment).  Likewise, the decedent in *Carlson* had a chronic asthmatic condition, which required him to be hospitalized for eight days; despite a recommendation that he be transferred to a facility in a more favorable climate, he was returned to the Terre Haute, Indiana, prison, where he did not receive proper medication and the prescribed steroid treatment; and he subsequently suffered a serious asthma attack, was put on a non-functioning respirator (which made his breathing worse), was administered contraindicated drugs, went into respiratory arrest, and died at the hospital.  *See Green*, 581 F.2d at 671.

Ultimately, given the different injuries, "this case is different in a 'meaningful' way [from *Carlson*] such that Congress might doubt the efficacy or necessity of a damages remedy in *this* context."  *Dynlacht*, 2025 WL 3026263, at *7 (emphasis in original) (citing *Muniz*, 149 F.4th at 262-63); *see also Morgan v. Arviza*, No. 24-1420, 2025 WL 3461554, at *3 (M.D. Pa. Dec. 2, 2025) ("Morgan, on the contrary, asserts that FCI Allenwood medical providers failed to properly treat his Charcot foot deformity and Lisfranc fractures over an extended period of time, resulting in the worsening of his severe foot problems and pain and suffering.  As Defendants correctly observe, the facts in *Carlson* bear little resemblance to the facts of the case at bar, thus presenting a new *Bivens* context.").

In addition, a "new" context may arise if, *inter alia*, "'the mechanism of injury' . . . is sufficiently different to render the [plaintiff's] claim a modest extension of *Carlson*."  *Kalu*, 113 F.4th at 327 (quoting *Abbasi*, 582 U.S. at 139))  *Carlson* and *Muniz* addressed straightforward claims of constitutionally deficient medical treatment, *e.g.*,: (1) Muniz alleged injuries (diabetic blisters with suppurating puss, extreme pain, infection, and amputation) resulting from the discontinuation of his prescribed diabetic medication and accommodations and subsequent

inadequate medical treatment, *Muniz*, 149 F.4tth at 258; (2) in *Carlson,* the estate alleged that "his injuries arose, in part, because 'he was not given proper medication,' 'did not receive the steroid treatments,' and was not granted facility-transfer accommodations for his asthmatic condition," resulting in "flare-ups," a hospital visit, and emergency care, *id.* (quoting *Green*, 581 F.2d at 671).

In contrast, Plaintiff claims that: (1) ARNP Hansen discontinued his special prescribed gluten-free diet and instructed him to self-select gluten-free items from the National Menu; (2) gluten-free items either were not made available to him to self-select from the national menu or the supposedly gluten-free items were contaminated with gluten; (3) Plaintiff was compelled to either (a) consume National Menu meals containing gluten, resulting in itchy rashes and bumps; or (b) purchase his own meals and eating processed foods at his own expense (which HSA Martin approved) to avoid the risk of further aggravation of his symptoms.  (ECF No. 43 at 1-5.)  As Federal Defendants put it, Plaintiff "challenges *how* the BOP provides prescribed medical diets" (*i.e.*, through either a "special" "pre-plated" gluten-free diet or self-selection of gluten-free items from the National Menu).  (ECF No. 61-1 at 14.)  In his response to the Motion, Plaintiff argues that he informed his health care providers that the prescribed self-selection process created a nutritionally inadequate diet and that Dr. DiMonte and ARNP Hansen ignored evidence suggesting that a self-selecting diet was inappropriate for Plaintiff's medical needs and "the gluten free diet offerings and the National Menu are radically differently," apparently because gluten-free items were not actually available as part of the National Menu or were otherwise tainted with gluten. (ECF No. 72 at 4-5.)  In his FAC, Plaintiff states that he informed ARNP Hansen that "gluten free items are not available from chow hall and therefore he has to eat these items."  (ECF No. 43 at 4 (quoting FAC14-15).)  Plaintiff purportedly was "forced to self-select [gluten-containing foods] off the National Menu, starve, or eat very unhealthy, expensive food [a]t at his own costs."  (ECF

No. 72 at 5.)  Plaintiff explains that his elevated A1C levels and fluctuating weight allegedly resulted from the fact he had to "consume unhealthy quantities of meals consisting mostly of processed food stuffs that were self-purchased due to lack of options," which "was like eating out of a vending machine or gas station."  (*Id.* at 4.)

Plaintiff's allegations do not resemble the straightforward claims of inadequate medical care considered in *Carlson* (and *Muniz*).  The allegations in the present matter instead involve a more complicated and convoluted causal link between the alleged inadequate medical treatment and Plaintiff's more serious injuries (especially the A1C levels), which allegedly resulted from Plaintiff having to purchase and consume unhealthy processed foods because uncontaminated gluten-free meals were not made available to him to self-select from the prescribed National Menu. *See Kalu*, 113 F.4th at 327 (comparing mechanisms of injury).  In fact, the alleged failures in offering and preparing untainted gluten-free food offerings on the National Menu are critical to Plaintiff's theory of liability.  Based on the FAC, if properly prepared gluten-free food had been made available to Plaintiff as part of the National Menu program, there would have been no rashes or any other injuries.

*Muniz* also concluded that, "[e]xcept as to alternative remedies, . .  this 'case does not present a risk of intrusion into the operations of the BOP any more than what *Carlson* already permits.'"  *Muniz*, 149 F.4th at 263 (quoting *Watanabe*, 115 F.4th at 1040).  But, as the Seventh Circuit has noted, *Carlson* involves the issue of "hands-on care" as opposed to "the formulation of medical-care guidelines, policies, or protocols in prison—or for that matter any other policy-making endeavor," and accordingly a claim that supervisory defendants failed to adopt appropriate protocols for first-line medical staff to follow constituted a new context.  *Brooks v. Richardson*, 131 F.4th 613, 616 (7th Cir. 2025); *see also Kalu*, 113 F.4th at 338 (cautioning against recognizing

27

a *Bivens* claim that "would expand prison officials' liability from previous *Bivens* actions to systemic levels, potentially affecting not only the scope of their responsibilities and duties but also their administrative and economic decisions" (citation omitted)). Plaintiff's claims implicate the systemic selection and preparation of gluten-free food offerings in the National Menu at FCI Fairton.[5]

"'Whether a context is new is an "easily satisfied" test because "a modest extension of the *Bivens* action is still an extension[,]"'meaning '[e]ven "significant parallels to one of the Supreme Court's previous *Bivens* cases" may not be enough.'" *Dynlacht*, 2025 WL 3026263, at *5 (quoting *Henry v. Essex Cnty.*, 113 F.4th 355, 361 (3d Cir. 2024)). Accordingly, with respect to the inadequate medical care theory of liability the Court concludes that two *Abassi* factors—the generality or specificity of the official action (including the disparate mechanisms of injury), and the risk of disruptive intrusion into the functioning of other branches—"present[] a new context,"

---

[5]    In his response, Plaintiff states that he could use discovery to reveal that the Federal Defendants have "a pattern, practice, habit, or routine in delaying or denying previously prescribed medical care from similarly situated inmates at FCI Fairton when they arrive in this facility; this is done for cost-saving measures." (ECF No. 72 at 2.) According to Plaintiff, a reasonable person could find that the BOP is implementing cost-saving measures to deprive "an illegal alien (and we have evidence that this has been done before) with a short sentence of his needed medical care." (*Id.* at 6.) However, a plaintiff cannot amend a complaint by filing a response to a motion to dismiss for failure to state a claim, *see Ibrahim v. DeFilippo*, No. 19-5021, 2021 WL 753898, at *8 (D.N.J. Feb. 26, 2021), and, in any event, Plaintiff also does not present any specific facts to support his conclusory "pattern and practice" assertions, *see Wilson*, 57 F.4th at 140. Furthermore, even if they could be considered, by broadly attacking medical care practices at the facility, the new assertions provide further confirmation that Plaintiff's claims "would expand prison officials' liability from previous *Bivens* actions to systemic levels, potentially affecting not only the scope of their responsibilities and duties but also their administrative and economic decisions," *Kalu*, 113 F.4th at 338 (citations omitted).

Plaintiff also states in passing in his response to the Motion that "[t]he Federal Defendants cannot provide [a] scintilla of evidence that Mr. Perez was ever advised how to self-select foods from the National Menu in any event." (ECF No. 72 at 5.) Plaintiff fails to allege in the FAC any facts regarding a failure to educate him on the process of self-selection, he cannot amend his pleading in his response to the Motion, and an alleged failure to counsel an inmate on how to select gluten-free foods does not resemble the circumstances in *Carlson* (or *Muniz*).

*Muniz*, 148 F.4th at 261 (emphasis omitted).[6]  *Id.*  Because both Eighth Amendment theories involve a new context, the Court must proceed to the second step of the *Bivens* analysis.

---

[6]      In *Muniz*, the Third Circuit ultimately concluded that the case presented a new context under the seventh (and final) *Abassi* factor (the presence of potential special factors that previous *Bivens* cases did not consider).  *Muniz,* 148 F.4th at 263.  Specifically, the *Muniz* court recognized that one special factor is "[i]f there are alternative remedial structures in place." *Id.* (alteration in original) (quoting *Egbert*, 596 U.S. at 493).  Accordingly, relief under *Bivens* is unavailable if the federal prisoner can file grievances through an Administrative Remedy Program ("ARP").  *Id.* at 263-64 (further noting that this special factor creates a new context even where the constitutional right at issue and the mechanism of injury is the same).  The Third Circuit concluded that Muniz was able to take advantage of the BOP ARP and, as it noted in *Kalu*, the ARP created a new context at step one of the *Bivens* inquiry because the program (and the Prison Litigation Reform Act ("PLRA")) did not exist (and were not considered by the Supreme Court) when the Supreme Court decided *Carlson.  Id.* at 264 (quoting *Kalu*, 113 F.4th at 327-28).

The Third Circuit further explained that the availability of the BOP ARP constituted a meaningful difference that distinguished "*this case*" (*Muniz*) from *Carlson* and that *Carlson* relief remains available to inmates in limited circumstances, specifically where "'prison administrators thwart inmates from taking advantage' of the ARP, 'such interference . . . renders the administrative process unavailable' as a remedy." *Id.* at 265 (quoting *Ross v. Blake*, 578 U.S. 632, 644 (2016)); *see also id.* at 265 n.5 (noting that the mere existence of the BOP ARP cannot meaningfully distinguish *Carlson* if the availability of that administrative remedy was not also considered because the program was established a year before *Carlson* was decided but years after the inmate was injured, the inmate could not avail himself of the program, and the Supreme Court did not factor it into its analysis).

In their reply, the Federal Defendants state that the Third Circuit held that a *Carlson*-like medical care claim cannot proceed absent "'limited circumstances,' for example if 'prison administrators thwart inmates from taking advantage of the ARP.'"  (ECF No. 75 at 2 (quoting *Muniz*, 149 F.4th at 265).)  According to the Federal Defendants, Plaintiff had access to the BOP ARP and does not allege any interference with his access to the administrative remedy process.  (*Id.*)  In his FAC, Plaintiff alleges that he has exhausted all available administrative remedies.  (ECF No. 43 at 1.)  But attached to the FAC is an email exchange with an FCI Fairton employee in which Plaintiff asked (quoting verbatim) "why they haven't submitted any of my remedy request i have filed four bp-8 it a; has to due with medical and nutrition;" the staff member responded that she did not have his BP-8s, the forms "must have been misplaced somewhere or sitting on someone's desk," and asked him to submit a BP-8; and Plaintiff indicated that he would submit the form.  (FAC22); *see also Mayer*, 605 F.3d at 230 (stating that court deciding a Rule 12(b)(6) motion can consider exhibits attached to the complaint)  Similarly, in his original Complaint, Plaintiff alleged that he "filed BP8, 9, 10" but the filings were lost or misplaced by staff, and he cited to this e-mail exchange (which was attached as an exhibit to the original pleading).  (ECF No. 1 at 5, 11.)  In *Millhouse v. Heath*, 815 F. App'x 628 (3d Cir. 2020), the Third Circuit concluded that, accepting his factual account as true on a motion for summary judgment, the

### 2.    Special Factors

Because Plaintiff seeks to extend the *Bivens* remedy to a new context, the Court must consider whether any special factors counsel hesitation before recognizing a new damages remedy in the absence of congressional authority.  A court should reject the proposed remedy if there is "*any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed,'" or if there is even the "*potential*" that "judicial intrusion into a given field might be harmful or inappropriate."  *Egbert*, 596 U.S. at 496 (citations omitted).  Plaintiff's claims fail at step two.

The *Muniz* court explained that the BOP ARP counseled against extending *Bivens*:

> In addition to creating a new context at step one, the BOP ARP "foreclose[s] the need to fashion a new, judicially crafted cause of action" at the second step as well. *Kalu*, 113 F.4th at 346 (quoting [*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)]).
>
> The effectiveness of the BOP ARP is, at best, dubious. *See id.* at 347 (Restrepo, J., concurring). But, in the step-two *Bivens* analysis, alternative remedies need not "provide complete relief." *Egbert*, [596 U.S. at 493] (quoting *Bush v. Lucas*, [462 U.S. 367, 388 (1983)]). The Court's jurisprudence cautions against the judiciary weighing the adequacy of alternative relief established by the political branches. *See* [*Goldey v. Fields*, 606 U.S. 942, 944-45 (2025).] Rather, so long as "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure," *Egbert*, [596 U.S. at 493] (quotation omitted), then "bedrock principles of separation of powers foreclose[ ] judicial imposition of a new substantive liability," *Malesko*, [534 U.S. at 69].

---

federal inmate satisfied the PLRA exhaustion requirement where the responsible official failed to respond to his ARP requests for informal resolution (*i.e.*, BP-8s), *id.* at 630-31 (further observing that regulatory presumption that a non-response acts as a denial triggering additional exhaustion obligations does not apply at the informal BP-8 resolution stage).

Accordingly, given the contents of the attached email, the Court cannot conclude at this juncture that the ARP factor presents a new context at the first step of the *Bivens* analysis; however, as explained above, the Court concludes that a new context is presented in this case based on other step one factors and the specific circumstances of the current matter.

Thus, at the second step, the availability of the BOP ARP is a "special factor[ ]" suggesting that a damages remedy "risk[s] ... interfering with the authority of the other branches." *Hernandez*, [589 U.S. at 102]. And this reason to hesitate, alone, forecloses *Bivens* relief. *See* [*Egbert*, 596 U.S. at 496]. At bottom, Muniz's *Bivens* claim fails because an alternative remedy existed and was made available to him.

*Muniz*, 149 F.4th at 264-65. Likewise, Plaintiff's *Bivens* claims fail because of the existence of the ARP process.[7]

Other considerations weigh against recognizing a damages remedy in the present circumstances. In addition to the BOP ARP, "Plaintiff had another avenue for relief, 'a federal

---

[7]    In addition, the BOP ARP weighs against the recognition of a *Bivens* remedy even if prison administrators thwarted Plaintiff's efforts to take advantage of the ARP, rendering the administrative process unavailable as a remedy for purposes of step one, *see Muniz*, 149 F.4th at 265, because of the different focus at step two:

In a recent non-precedential opinion, the Third Circuit considered an inmate's allegation that prison officials had thwarted his attempts to use the BOP ARP by failing to provide him with necessary grievance forms and legal papers. *See Fields v. Fed. Bureau of Prisons*, No. 24-2329, 2025 WL 2409060, at *2 (3d Cir. Aug. 20, 2025) (*per curiam*). The Circuit found that the existence of an alternative remedial structure counselled against extending *Bivens*, even assuming prison employees did not afford the plaintiff adequate opportunities to utilize the prison's grievance system. *Id.* at *3 (citing *Goldey*, 606 U.S. at 944-45; *Egbert*, 596 U.S. at 497-98 ("[W]e have never held that a *Bivens* alternative must afford rights to participation or appeal.").) The Circuit noted that in the special factors analysis, "the focus is not on the individual's recovery at all but rather on the fact that Congress created a remedial process that it found sufficient to deter unconstitutional action against prisoners." *Id.* (cleaned up) (citing [*Xi v. Haugen*, 68 F.4th 824, 837 (3d Cir. 2023)]); *see also Steele v. Miller*, No. 25-3108, 2025 WL 1755188, at *3 (D. Kan. June 25, 2025) (finding no *Bivens* remedy available to pretrial detainee who brought Fifth Amendment deliberate indifference to medical needs claims and who challenged the effectiveness and practicality of pretrial detainees using the BOP ARP).

*Dynlacht*, 2025 WL 3026263, at *8 n.9.

injunction,'" and, in fact, Plaintiff sought injunctive relief in this matter, requesting an order for the immediate reinstatement of his gluten-free special medical diet (ECF No. 43 at 5), *see supra* Section III.A. *Toro*, 2024 WL 3548893, at *8 (quoting *Dongarra v. Smith*, 27 F.4th 174, 181 (3d Cir. 2022)). The availability of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, also constitutes a special factor in inadequate medical care cases. *See Toro*, 2024 WL 3548893, at *8 (recognizing that, had plaintiff perfected his FTCA claims, he could have sought damages for his injuries under state law tort theories such as negligence or medical malpractice, and that, while the named defendants and legal bases for liability would be different, the factual bases and the nature of relief (damages) would be identical). Finally, when Congress passed the PLRA over a decade after *Carlson* was decided, Congress made comprehensive changes in the way prisoner claims of mistreatment must be brought in the federal courts, had the specific occasion to consider the issue of prisoner abuse and how to remedy such wrongs, but chose not to provide a specific damages remedy against federal prison personnel.[8] *See id.* (quoting *Abbasi*, 582 U.S. 148-49).

### C.    Section 1983 and State Law Claims

According to the FAC, Plaintiff files this action pursuant to 42 U.S.C. § 1983. (ECF No. 43 at 1.) In his response to the Motion, Plaintiff further states that, even if this case presents a new context under the *Bivens* framework, "surely there is New Jersey state law that restricts prison officials from withholding adequate nutrition for non-medical reasons." (ECF No. 72 at 2.) The Federal Defendants move to dismiss the § 1983 claims. (ECF No. 61-1 at 28-29.)

---

[8]    Because the Court dismisses the *Bivens* claims pursuant to the *Bivens* two-step framework, it does not address the Federal Defendants' alternative qualified immunity argument (*see* ECF No. 61-1 at 21-28).

Section 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" shall be liable to the injured party in action at law. Accordingly, "only state action can give rise to liability under § 1983," *Hackett v. U.S. Dep't of Just.*, No. 23-23181, 2025 WL 1585542, at *5 (D.N.J. June 5, 2025) (quoting *Lindke v. Freed*, 601 U.S. 187, 193 (2024)), and federal officers are "facially exempt from Section 1983 liability inasmuch as in the normal course of events they act pursuant to federal law," *id.* (quoting *Beale v. Dep't of Just.*, No. 06-2186, 2007 WL 327465, at *7 (D.N.J. Jan. 30, 2007)); *see also Murray v. DeJoy*, No. 23-0423, 2024 WL 4024073, at *5 (D.N.J. Sept. 3, 2024) (observing that the Third Circuit has repeatedly held that § 1983 provides no remedy for actions by federal actors). Plaintiff, a convicted and sentenced federal inmate incarcerated at FCI Fairton, alleges that the Federal Defendants were employed by the BOP at FCI Fairton, and he does not allege that the Federal Defendants were acting under the color of *state* law when they allegedly violated his constitutional rights. (ECF No. 1 at 2; ECF No. 43 at 1); *Murray*, 2024 WL 4024073, at *6. Furthermore, there is no indication that the Federal Defendants were party to a conspiracy with state officials. *See id.* at *5-6 (noting that a plaintiff may assert a claim under § 1983 against a federal official if the official was conspiring with state officials acting under color of state law). Accordingly, Plaintiff's § 1983 claims against the Federal Defendants must be dismissed.

Liberally construing the FAC, the pleading evidently raises claims against the Federal Defendants for violations Plaintiff's federal and state constitutional rights under the New Jersey Civil Rights Act ("NJCRA"), and tort claims for negligence and medical malpractice under New

Jersey law. The Federal Defendants do not mention any state law claims; however, the PLRA provides that the Court shall review a complaint in which a prisoner seeks redress from an officer or employee of a governmental entity and dismiss any portion of the complaint that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, 28 U.S.C. § 1915A(a), (b). It is well established that the Westfall Act, 102 Stat. 4563-67 (1988), "made the [FTCA] 'the exclusive remedy for most claims against [federal] Government employees arising out of their official conduct.'" *Henry*, 113 F.4th at 364 (alteration in original) (quoting *Hui v. Castaneda*, 559 U.S. 799, 806 (2010)). Plaintiff's claims may only be brought against the United States pursuant to the FTCA. *See id.*; *Toro v. Asao*, No. 20-2282, 2020 WL 5988268, at *3 (D.N.J. Oct. 9, 2020). Accordingly, Plaintiff's claims under state law against the Federal Defendants are dismissed.[9]

### D. Dismissal With or Without Prejudice and Leave to Amend

The Federal Defendants ask the Court to dismiss the FAC with prejudice and without leave to file a second amended complaint. (ECF No. 75 at 3.) The claims for prospective relief are dismissed without prejudice. *See Lamberti-Ledezma*, 2025 WL 3033990, at *3 & n.6 (explaining that dismissal for lack of subject matter jurisdiction is ordinarily without prejudice because it is not a determination on the claim's merits). As to Plaintiff's *Bivens* and § 1983 claims, Third Circuit "precedent supports the notion that in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). The Court cannot conclude at this juncture

---

[9]     Claims under the FTCA are also subject to "a jurisdictional requirement that [the plaintiff] must file a claim with the appropriate agency, and receive a final denial of the claim before filing a lawsuit." *Lamberti-Ledezma*, 2025 WL 303990, at *4 (citing 28 U.S.C. § 2675(a)).

that it would be futile for Plaintiff to file a second amended complaint curing the deficiencies identified by this Court with respect to the *Bivens* and § 1983 claims, and accordingly such claims are dismissed without prejudice. Finally, because it would be futile to permit a curative amendment with respect to the state law claims against the Federal Defendants, the state law claims against the Federal Defendants are dismissed with prejudice.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion is **GRANTED in part** and **DENIED in part**. The Court **DISMISSES with prejudice** Plaintiff's state law claims against the Federal Defendants and **DISMISSES without prejudice as moot** his claims for prospective relief. Plaintiff's *Bivens* and § 1983 claims are **DISMISSED without prejudice**. Within forty-five (45) days of the date of entry of the accompanying Order, Plaintiff may submit a second amended complaint if he can cure the deficiencies identified in this Opinion. An appropriate Order will be entered.


DATED:   December 31, 2025

_____
GEORGETTE CASTNER
United States District Judge